1  Charles M. Binks, Plaintiff in pro per
2  P.O. Box 732
   Yorba Linda, California 92886
3  (714) 395 7777
   firefightersfunding@hotmail.com
4

5  Plaintiff in pro per

6

7

8          UNITED STATES DISTRICT COURT
   CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA
9

10

11 CHARLES MICHAEL BINKS,          )
                                   )  **CASE NO.:** SACV08-1236 AG (MLGx)
12                                 )
   Plaintiff,                      )
13                                 )
14 v.                              )  **COMPLAINT FOR**
                                   )  **DAMAGES FOR**
15 DSL.NET, INC., a Delaware       )  **VIOLATIONS OF THE**
   corporation; DSL.NET            )  **SARBANES OXLEY ACT**
16 COMMUNICATIONS, VA, INC., a     )  **OF 2002, SECTION 14(A) OF**
17 Virginia corporation; DSL.NET   )  **THE SECURITIES**
   ATLANTIC, LLC., a Delaware      )  **EXCHANGE ACT OF 1934,**
18 corporation; MEGAPATH, INC., a  )  **BREACH OF FIDUCIARY**
19 Delaware corporation, MDS       )  **DUTY, WASTE OF**
   ACQUISITION, INC., a Delaware   )  **CORPORATE ASSETS,**
20 corporation; NETIFICE           )  **UNJUST ENRICHMENT,**
   COMMUNICATIONS, INC., a         )  **ACCOUNTING,**
21 Delaware corporation, DAVID F.  )  **RESCISSION AND FOR A**
22 STRUWAS; KEIR KLEINKNECHT;      )  **CONSTRUCTIVE TRUST**
23 KIRBY G. PICKLE; WILLIAM J.     )
   MARSHALL; JAMES D. MARVER;      )
24 ALAN E. SALZMAN; PAUL J.        )
25 KEELER; ROBERT B. HARTNETT,     )
   JR.; ROBERT G. GILBERTSON;      )
26 STEVEN B. CHISHOLM; J.          )
27 BROOKE MASTIN; PAUL MILLEY;     )
28 E. CAREY WALTERS; MARC R.       )

---

                          1
          **PLAINTIFF'S COMPLAINT FOR DAMAGES**

ESTERMAN; ROGER
EHRENBERG; RODERICK GLEN
MacMULLIN; KENNETH
KHARBANDA; DEUTSCHE BANK
TRUST COMPANY, a Delaware
Corporation; DEUTSCHE BANK
TRUST COMPANY AMERICAS, a
Delaware corporation; DEUTSCHE
BANK AG LONDON
DIVISITURE, a foreign corporation;
VANTAGEPOINT VENTURE
PARTNERS, L.P.; a Delaware limited
partnership; VantagePoint Venture
Partners III(Q), L.P., a Delaware
limited partnership; VantagePoint
Venture Associates III, L.L.C., a
Delaware limited liability partnership;
VantagePoint Venture Partners III,
L.P., a Delaware limited partnership;
Vantage Point Communications
Partners, L.P., a Delaware limited
partnership; Vantage Point Venture
Associates, L.L.C., a Delaware limited
corporation; Vantage Point
Communications Associates, LLC., a
Delaware limited corporation; Vantage
Point Venture Partners 1996, L.P.;
MICHAEL L. YAGEMANN; Michael
Sowata; D. CRAIG YOUNG; THE
BANK STREET GROUP, a Delaware
corporation; DUNKNIGHT
TELECOM, LLC., a Delaware
Corporation; KNIGHT VISION
FOUNDATION, INC., a non-profit
Florida corporation; LAURUS
MASTER FUND LTD., a Cayman
Islands company; HARRY HOPPER;
COLUMBIA CAPITAL, INC., a
Delaware corporation; Columbia
Capital Equity Partners II (QP), L.P., a
Delaware limited partnership;

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**2**

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

1 COLUMBIA CAPITAL EQUITY                )
2 PARTNERS, III Q.P., L.P, a Delaware    )
  limited partnership; Columbia          )
3 Cardinal Partners, LLC, a Virginia     )
4 limited liability company; Columbia    )
  Broadslate Partners, LLC., a Delaware  )
5 limited liability corporation; Columbia )
6 Capital Equity Partners III (AI), L.P., a )
  Delaware limited partnership;          )
7 LAFAYETTE PRIVATE EQUITIES,            )
8 INC., a Delaware corporation;          )
  LAFAYETTE INVESTMENT FUND,             )
9 L.P., a Delaware limited partnership;  )
10 Charles River Partnership X, a        )
  Delaware Partnership ; Charles River   )
11 Partnership X-A, a Delaware           )
12 partnership; Charles River Partnership )
  X-B, a Delaware partnership; Charles   )
13 River Partnership X-C, a Delaware     )
14 partnership; N.I.G.-Broadslate, Ltd., a )
  Cayman Islands corporation; E-         )
15 TRADE FINANCIAL CORPORATE
16 SERVICES, INC., a Delaware
  corporation; CEDE & CO., a
17 Delaware corporation; DEPOSITORY
18 TRUST COMPANY, a New York,
  foreign corporation, and DOES 1
19 through 100,

20
                 Defendants
21

22 .

23      **COMES NOW**, Charles M. Binks, on behalf himself and all similarly

24

25 situated shareholders of DSL.net and files this Complaint brought directly and on

26 behalf of the class against Defendants for violations of the Federal Sarbanes Oxley

27 act of 2002, Section 14(a) of the Securities Exchange Act of 1934, breach of

28

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

rescission and for a constructive trust.  This Court has jurisdiction in this case arising under Article III of the Constitution and 28 U.S.C. § 1331 because of claims arising under Sarbanes-Oxley and Section 14(a) of the Exchange Act. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.  This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because: (i) Defendants maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to DSL.net occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

## SUMMARY AND OVERVIEW OF ACTION

1.     By this action, Plaintiff Binks seeks to remedy the injury inflicted on him as a shareholder of DSL.net, by a host of undisclosed past wrongs against DSL.net, directed by faithless directors and senior executives who were aided and abetted by other self-interested parties.  Through their illegal actions, defendants manipulated DSL.net into a position of financial and strategic weakness, and a Company of a "going concern" which coalesced in a transaction with MegaPath ("The MegaPath Transaction" or "The Transaction") by which MegaPath gained absolute control over DSL.net .  The Transaction, together with the fact that the board of directors has demonstrated a lack of faithfulness to the Company, would render a demand on the Company to pursue an action against defendants futile, and has therefore necessitated this amended action brought directly against Defendants.

2.     Mr. Binks alleges, upon knowledge as to himself and his own acts and upon information and belief as to all other matters, as follows:

3.     By this action, Mr. Binks seeks to remedy the injury inflicted by a scheme that was directed by faithless, self-dealing directors, senior officers, and other interested parties, some whom have a history of working together, and continue to work together in the telecommunications industry and real estate development industry.  This planned out scheme defrauded Mr. Binks of his $1.5 million investment in the publicly traded company DSL.net.  Through this complaint, DSL.net was manipulated from what should have been a thriving

telecommunications company to that of a company of going concern. The controlling stockholder, the VantagePoint entities ("VantagePoint") did not disclose their true ownership of DSL.net nor did they disclose they were the controlling stockholder from the beginning days of the company, which ultimately gave VantagePoint the voting rights of DSL.net and the election of directors to their advantage, an advantage that profited VantagePoint's general partners, DSL.net's officers and directors, and other interested parties multi-millions of dollars. Through this scheme, DSL.net was manipulated to the threat of bankruptcy. However, bankruptcy was not in the plans for DSL.net because, if there was a bankruptcy sale, the approximate $450 million tax carry forward would be eliminated and all of DSL.net's assets would not have been able to be transferred to interested parties.   Additionally, if there was a bankruptcy, it would have been mandatory that an appraisal be completed which would disclose DSL.net's assets and accounting records.  What the plan entailed was for MegaPath Inc. ("MegaPath") to purchase DSL.net through a short form merger, which allowed DSL.net to be acquired for fractions of a penny.  Defendant, D. Craig Young, the CEO and Director of MegaPath, as well as a Special Advisor of Defendant Bankstreet, was conflicted in this short form merger and purchased DSL.net for a price of $13 million, in which $3 million was paid to a self interested party, Defendant Keir Kleinknecht.  Defendant Kleinknecht was brought in for a nine month predatory financing transaction that disguised the self dealing of this short

form merger with MegaPath.  While DSL.net's stockholders were offered a mere one-thousandth of a penny through this short form merger (with equates to $239,000) VantagePoint's officers and directors, along with other defendants, eventually started selling shares of an exact competitive telecommunications company named CBeyond for $40 per share, a competitive telecommunications company they did not disclose to DSL.net's stockholders they were affiliated. While interested parties were secretly starting competitive telecommunications companies, they used the regulatory agencies to send out blanket letters in 22 states requesting to cancel services of DSL.net customers in the scheme alleged and migrated those valuable customers and assets to private companies in which they were associated.  These blanket letters to cancel customers were sent out in the early days of the company starting in 2001, and during a timeframe in which DSL.net had just raised millions of dollars.  More importantly, these letters to cancel customers were not disclosed to the stockholders.  Where did these customers go?  Surely, there was a telecommunications company out there to purchase those valuable customers since telecommunications companies pay their sales forces great sums of money to solicit new customers.  Additionally, there were telecommunications companies out there that would have eagerly taken the customers off the hands of DSL.net at no expense to DSL.net for moving equipment, etc.  However, to sell the customers, or give the customers to another telecommunications company would not have allowed the interested parties to charge DSL.net all the tax losses it generated

PLAINTIFF'S COMPLAINT FOR DAMAGES

(approximately $450 million) thus defrauding the Internal Revenue Service tax carry forward that sailed smoothly right along with the short form merger with Defendant MegaPath. An approximate $450 million tax forward alone is worth far more than the $13 million in which DSL.net was purchased, not to mention the multi-million dollar infrastructure, the customer base, assets, etc. that additionally went with the short form merger to MegaPath. A mere $239,000 was allotted to DSL.net's stockholders and Mr. Binks was offered $25,000 for his $1.5 million investment. At the time of MegaPath's investment, and before any stockholder vote, MegaPath did not perform the short form merger, but instead converted its debt into 800 million of DSL.net's common stock which gave MegaPath 53% of DSL.net's voting power. These shares, however, were illegally issued and MegaPath was not legally permitted to vote those shares, as they were derivative shares. MegaPath and its entities took months consummating the short form merger, and during those months they sold securities of the company, receiving what well may have exceeded their $13 million. In the scheme alleged, DSL.net was self dealt to MegaPath, along with DSLnet's assets and the manipulated $450 million tax carry forward.

**THE PARTIES**

**THE PLAINTIFF**

4. Plaintiff, Charles M. Binks, beneficially owns (owned) in excess of twenty three million (23,000,000) shares of DSL.net's common stock, for which Mr. Binks has paid more than $1,500,000 over the course of the past seven years, including

some shares purchased in connection with DSL.net's initial public offering in 1999. Mr. Binks is one of the largest individual holders of DSL.net's common stock.

DEFENDANT DSL.net

5. Defendant DSL.net was a Delaware corporation, with its principal executive offices at 50 Barnes Park North, Suite 104, Wallingford, CT. DSL.net itself and through its affiliates, provides high-speed data communications, Internet access, and related services to small and medium sized businesses and branch offices of larger businesses and their remote office users, throughout the United States, primarily utilizing digital subscriber line and T-1 technology or substantially equivalent technology. In September of 2003, DSL.net expanded its service offerings to include integrated voice and data services using voice over Internet protocol ("VOIP") technology to business customers in select Mid-Atlantic and Northeast markets. DSL.net's networks enable data transport over existing copper telephone lines at speeds of up to 1.5 megabits per second.

6. Defendant DSL.net Communications, Virginia, Inc. is a Virginia corporation that was a wholly owned subsidiary of DSL.net, but is currently still operation as a telecommunications company.

7. Defendant DSL.net Atlantic, LLC, is a limited liability Delaware corporation that was a wholly owned subsidiary of DSL.net, but is currently still operation as a telecommunications company.

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

8. Defendant David F. Struwas ("Struwas") has been a member of the DSL.net Board since November 2005. During that same time period, Struwas also has served as DSL.net's President and Chief Executive Officer. Struwas was one of DSL.net's founders. Struwas also is a member of DunKnight. Additionally, in connection with the approval of the illegal scheme challenged herein, DSL.net entered into an executive compensation agreement with Struwas, providing for supplemental retention compensation that will be payable to Struwas if he remains employed by DSL.net on February 28, 2007. Struwas negotiated and voted to approve the MegaPath Acquisition.

9. Defendant Marc R. Esterman ("Esterman") has served as Vice President – Corporate Affairs, General Counsel and Secretary for DSL.net since December 2003. Previously, Esterman served as Vice President – Corporate Affairs and Associate General Counsel of DSL.net from May 2003 to December 2003, and as Associate General Counsel of DSL.net from June 2000 to May 2003. Esterman helped to negotiate the MegaPath Acquisition.

10. Defendant Kirby G. Pickle ("Pickle") was a member of the DSL.net Board from June 2004 through November 2005. Pickle also served as DSL.Net's Chief Executive Officer from April 2004 through November 2005. Before resigning from the DSL.net Board, defendant Pickle negotiated and voted to authorize the usurious transaction that resulted in DunKnight realizing a $2.4 million gain on a $10 million investment over the time frame of nine months. Also, Defendant Pickle

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

had a direct interest as a partner in VantagePoint, and received payment from the proceeds of the DunKnight transaction and other special employment bonuses, along with extra payment for his alleged "foreign" corporation status.

11. Defendant Robert G. Gilbertson ("Gilbertson") served as a member of the DSL.net Board from January 1999 through August 2006, when he agreed to resign in favor of a MegaPath designee. Before resigning from the DSL.net Board, defendant Gilbertson voted to authorize the MegaPath Acquisition.

12. Defendant Robert B. Hartnett, Jr. ("Hartnett") has been a member of the DSL.net Board since May 2002 and voted to authorize the MegaPath Acquisition and to give MegaPath the shares needed to become the controlling stockholder.

13. Defendant Paul J. Keeler ("Keeler") has been a member of the DSL.net Board since June 2001. Defendants Hartnett and Keeler both voted to authorize the MegaPath Acquisition and to give MegaPath the shares to become the controlling stockholder.

**MEGAPATH DEFENDANTS**

14. Defendant MegaPath is a Delaware corporation, with its principal executive offices at 555 Anton Boulevard, Suite 200, Costa Mesa, CA. MegaPath is a leading provider of secure access and managed network solutions combining broadband connectivity, VPN, IP telephony and security technologies. MegaPath was formerly was known as Netifice Communications, Inc.

15.     Defendant Netifice Communications, Inc., was and is a Delaware corporation (hereinafter "Netifice"). Netifice (which changed its name to MegaPath two weeks before the merger with DSL.net,  and whose officers and directors were Defendants Young, Chisholm, Milley, Walters, and Mastin, and were linked to VantagePoint and DSL.net), held DSl.net's second largest wholesale  agreement to provide services at a wholesale price.   In a Press release dated December 9, 2003, DSL.net reported that the Netifice Wholesale agreement was the second largest contract of DSL.net.

16.     Defendant MDS Acquisition, Inc. ("MDS") is a Delaware corporation, which is a wholly-owned subsidiary of MegaPath and was formed to facilitate the MegaPath Acquisition.

17.     Defendant D. Craig Young ("Young") is and was President and CEO of MegaPath, Inc. and was instrumental in the purchase of DSL.net by MegaPath. Also, Defendant Young failed to disclose his interest in Defendant Bank Street. Defendant Young's interest in Defendant Bank Street was such that the failure to disclose his interest was fraudulent  and a breach of fiduciary duty.

18.     Defendant Paul Milley ("Milley") was appointed to the DSL.net Board on August 28, 2006, as a designated representative of MegaPath.  Milley has been the Chief Financial Officer of MegaPath since April 2006, previously serving as the Chief Financial Officer of a wholly-owned subsidiary of MegaPath from October 2001 to April 2006. Milley has also been a director and the Chief Financial Officer

of MDS since August 2006. As a member of the DSL.net Board, Milley has supported the proposal to amend DSL.net's certificate of incorporation to facilitate the MegaPath Acquisition.

20.     Defendant Emerson Walters ("Walters") was appointed to the DSL.net Board on August 28, 2006 as a designated representative of MegaPath. Walters has served as Director of Business Development at MegaPath since October 2004. As a member of the DSL.net Board, Walters has supported the proposal to amend DSL.net's certificate of incorporation to facilitate the MegaPath Acquisition.

21.     Defendant Steven B. Chisholm ("Chisholm") is General Counsel for MegaPath and designated by MegaPath to become a member of the DSL.net Board on January 18, 2007.  Chisholm has served as Senior Vice President of MegaPath since he joined MegaPath in August 2004.  Chisholm has also been a director and Senior Vice President of MDS since August 2006. As a member of the DSL.net Board, Chisholm supported the proposal to amend DSL.net's certificate of incorporation to facilitate the MegaPath Acquisition, and failed to vote to cancel the Special Meeting.  Plaintiff Binks believes and thereupon alleges that Defendant Chisholm is a licensed attorney in Canada and is practicing law in the United States without a license.

22.     Defendant J. Brooke Mastin ("Mastin") has been designated by MegaPath to become a member of the DSL.net Board on January 18, 2007. With MagaPath, Mastin has served since July 2004, initially as Vice President, Finance

and since May 2006 as Vice President of Mergers and Acquisitions. As a member of the DSL.net Board, Mastin supported the proposal to amend DSL.net's certificate of incorporation to facilitate the MegaPath Acquisition, and will fail to vote to cancel the Special Meeting.

23.   The Bank Street Group is a Delaware corporation which, on or about February 1, 2006, DSL.net hired  to act as DSL.net's exclusive agent and financial advisor with respect to exploring strategic alternatives for the sale of DSL.net.  Bank Street was to identify and assist in the solicitation of interested prospective third parties. D. Craig Young (the officer, director, and CEO of MDS Acquisitions and MegaPath) held a position of "Special Advisor" to BankStreet—thus making BankStreet an undisclosed interested party, not the independent advisor that it should have been and was misleadingly portrayed to be.  Additionally, the DSL.net Defendants and BankStreet failed to disclose to the stockholders the names of the companies who were interested in DSL.net, and instead hid their identities by referring to them simply as Companies A, B, and C.  The defendants withheld other material information from the Proxy:  they did not disclose of the number of DSL.net  customers and subscribers, they did not disclose the valuable real estate owned or controlled by DSL.net, they did not fully disclose DSL.net's valuable data center network or other company assets, they did not give a list of what was being sold (except for the debt), nor did they disclose the tax carry forward benefit that went with the sale which was approximately a gross of  $450 million.

**DUNKNIGHT DEFENDANTS**

24.    Defendant DunKnight Telecom, LLC is a Delaware Limited Liability Corporation, which was paid in excess of portions $12.4 million out of proceeds paid by MegaPath to DSL.net in connection with the illegal scheme challenged herein – netting an excess of a 30% gain on a $10 million investment made only nine months earlier.

25.    Defendant Knight Vision Foundation is a Florida non-profit corporation, founded by Defendant Keir Kleinknecht, which was paid a portion of $12.4 million out of proceeds paid by MegaPath to DSL.net in connection with the illegal scheme challenged herein – netting in excess of a 30% gain on a $10 million investment made only nine months earlier.  The investment was improper and illegal given Knight Vision's non-profit status.

26.    Defendant Keir Kleinknecht ("Kleinknecht") served as a member of the DSL.net Board from November 2005 through August 2006, when he agreed to resign in favor of a MegaPath designee. Kleinknecht is the founder and sole managing member of DunKnight.  Kleinknecht is also the founder of Knight Vision Foundation.  Kleinknecht participated in self-dealing transactions in which the Board agreed to pay the Knight Companies shares to extend the maturity debit owed to the Knight Companies by DSL.net.  Furthermore, Kleinknecht participated in the negotiation and voted to approve the MegaPath Acquisition, despite it being a self-interested transaction for him.

## VANTAGE POINT DEFENDANTS AND SERIES X INVESTORS

27.    Defendant VantagePoint Venture Partners, L.P. (hereinafter "VPVP") is a Delaware limited partnership, which is a venture capital company with more than $4 billion of assets under its management.  VPVP was the primary Series X investor, controlling shareholder of DSL.net throughout most of the company's existence.

28.    Defendants VantagePoint Venture Partners III(Q), L.P., is a Delaware limited partnership; VantagePoint Venture Associates III, L.L.C., is a Delaware limited liability partnership; VantagePoint Venture Partners III, L.P., is a Delaware limited partnership; VantagePoint Communications Partners, L.P., is a Delaware limited partnership; VantagePoint Venture Associates, L.L.C., is a Delaware limited corporation; VantagePoint Communications Associates, LLC., is a Delaware limited corporation; and VantagePoint Venture Partners 1996, L.P. is a Delaware limited partnership [collectively referred to herein "VPVP and it entities"] are collectively subsidiaries of VPVP and were each Series X investors, and controlling shareholder of DSL.net throughout most of the company's existence.  VantagePoint Venture Partners III LP is the VPVP's entity in which Defendant Salzman is the Managing and/or General Partner and the VPVP entity in which multi-millions of dollars gained by VPVP ran through.

29.    Defendants Marver, Marshall, and Salzman are managing partners, officers, directors, and shareholders of the following Defendant companies:  VantagePoint

Venture Partners, L.P..; VantagePoint Communications LLC; VantagePoint Venture Associates III, LLC; VantagePoint Venture Partners (1996); VantagePoint Communications Partners, L.P.; VantagePoint Venture Partners III (Q), L.P.; VantagePoint Venture Partners III (LP) [collectively referred herein as "VPVP", "VPVP and its entities" or "VantagePoint"].  Defendants Marver, Marshall, and Salzman represented the interests of the VPVP as controlling shareholders and Board members of DSL.net.  Also, each of these entities and individual defendants were the Series X Preferred Shareholders and may be referred to herein as "Series X Shareholders".

30.     Defendant William J. Marshall ("Marshall") was a member of the DSL.net Board from January 1999 through November 2005. Marshall also was a Partner with VantagePoint and an affiliate of Deutsche Bank. Before resigning from the DSL.net Board, defendant Marshall voted to authorize the usurious transaction that resulted in DunKnight realizing a $2.4 million gain on a $10 million investment over the time frame of nine months. As alleged more fully herein, Marshall authorized this transaction in order to provide funds for DSL.net to repurchase equity and debt securities held by VantagePoint and Deutsche Bank. William Marshall was the cofounder of the ATM Forum, and a board member of the Securities Industries Association for Technology; from 1985-1996 Marshall was the senior, managing director and chief technology officer of the communications technology group at Bear Sterns & Co.; from 1996-1998, William Marshall was the senior advisor to

Vantage Point Venture Partners; in 1998, he was promoted to a partner of Vantage Point Venture Partners.  The Plaintiff hereby alleges that it was illegal and improper for William Marshall to serve on DSL.net's independent committee because, at the time, he owned a large amount of the voting stock of the Company and, at the same time, was the managing partner of VantagePoint Venture Partners.  .

31.    Defendant James D. Marver ("Marver") was a member of the DSL.net Board, and controlling stockholder of DSL.net.  Marver also was a founder and managing partner of the VantagePoint Venture Partners entities.   Marver failed to disclose his true stock interest in DSL.net, violated the Sarbanes Oxley Act by omitting information on filings with the SEC and, and self-dealt himself millions of dollars in dividends.

32.    Defendant Alan Salzman was managing and general partner of various VantagePoint entities, including VantagePoint Venture Partners III LP.   Salzman failed to disclose his true stock interest in DSL.net  and never filed any Beneficial Ownership Statements (Form 3's, Form 4's or Form 5's) yet Salzman was shown voting shares on the proxy.  Additionally, after DSL.net's Initial Public Offering, Salzman filed a Form D (Notice of Sale of Securities) with the Securities and Exchange Commission trying to disguise his General and or Managing Partner status of VantagePoint Venture Parters III LP, the entity in which multi-millions gained by Salzman ran through.  Because of the nature of his position with

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

VantagePoint Venture Partners III LP, he was also a controlling shareholder of DSL.net.

33.     Defendant Kenneth Kharbanda, was a managing partner of VPVP, and was appointed, in lieu of a security agreement, to serve on the DSL.net Board. Defendant Kharbanda, however, was conflicted, and failed to disclose that he also promoted and sold securities of a direct competitor to DSL.net, CBeyond, Inc.

34.     Michael L. Yagemann served on the Board of DSL.net and managing partner and member of VPVP.

35.     VantagePoint Venture Partners III, L.P., of which James D Marver and Alan E Salzman were the General and/or Managing Partners.  Defendants Marver and Salzman and Marshall are members of the general partner of each of the VantagePoint  entities.  On or about November 14, 2001, the DSL.net entered into a Series X Convertible Preferred Stock Purchase Agreement (the "Purchase Agreement") with several private investment funds affiliated with VantagePoint Venture Partners (collectively "VantagePoint") for the purchase of up to 20,000 shares of convertible preferred stock at $1,000 per share (see note 8, Subsequent Events). Pursuant to the Purchase Agreement, the Company received $6 million on November 14, 2001, from the sale of 6,000 shares of convertible preferred stock and VantagePoint agreed to purchase an additional 4,000 and 5,000 shares in subsequent closings on or after December 10, 2001, and February 28, 2002, respectively.

36.     Marver and Marshall were members of the general partner of each of the VantagePoint entities and beneficially owned 2,574,822 shares and warrants to purchase 10,416 shares held by VantagePoint Venture Partners 1996, L.P., of which VantagePoint Associates, LLC was the general partner. Also, included were 5,087,145 shares and warrants to purchase 20,834 shares held by VantagePoint Communications Partners, L.P., of which VantagePoint Communications Associates, LLC was the general partner and 573,614 shares held by VantagePoint Venture Partners III, L.P., of which James D Marver and Alan E Salzman was the general and managing partner.

**DEUTSCHE BANK DEFENDANTS**

37.     Defendant Deutsche Bank Trust Company, was and is a Delaware Corporation. Deutsche Bank Trust Company Americas, was a Delaware corporation that was and is a subsidiary of Deutsche Bank Trust Company and acted as its agent; Deutsche Bank AG London Divistiture, is a foreign company that of unknown relation to Defendant Deutsche Bank Trust Company and Deutsche Bank Trust Company Americas. Collectively, these defendants are referred to herein as "Deutsche Bank." Collectively, on or about July 18, 2003, the Deutsche Bank entities entered into a Note and Warrant Purchase Agreement (the "Note and Warrant Purchase Agreement") with DSL.net. This transaction was facilitated by Defendants VantagePoint Venture Partners III (Q), L.P., VantagePoint Venture Partners III, L.P., VantagePoint Communications Partners, L.P. and VantagePoint

Venture Partners 1996, L.P., and related to the sale of an aggregate of (i) $30,000 in senior secured promissory notes (the "Notes") and  (ii) warrants to purchase an aggregate of 157,894,737 shares of the Company's common stock for a period of three years at an exercise price of $0.38 per share (the "Warrants"). The aggregate purchase price for the Notes and Warrants was $30,000.  The Company's obligations under the Notes were secured by a security interest in a majority of the personal property and assets of DSL.net the Company and certain of its subsidiaries.

38.     Defendant Roderick MacMullin served on the DSL.net Board of Directors, appointed on behalf of the Deutsche Bank and VPVP.

39.     Defendant Roger Ehrenberg was a DSL.net Director and officer of the Deutsche Bank entities.  Defendants Deutsche Bank Trust Company, a Delaware Corporation, and Deutsche Bank Trust Company Americas, a Delaware corporation; Deutsche Bank A.G. London Divestiture, a foreign corporation doing business in the United States and Delaware, operating through Defendant Roger Ehrenberg, entered into a note and warrant purchase agreement with DSL.net to issue an aggregate of $30 million principal amount of notes that was due and payable on the maturity date of July 18th 2006.  Subject to the terms and conditions of the note and warrant purchase agreement, DSL.net issued a warrant to purchase 12,950,000 shares of DSL.net common stock.  In addition, DSL.net issued them the right to purchase an aggregate of 144,944,737 shares of DSL.net common stock, with Deutsche Bank acting through DB Advisors LLC as the investment agent and VantagePoint Venture

Partners III L.P. (VPVP III LP) whose owners, and general and managing partner was Defendant James D. Marver and Defendant Alan E. Salzman.

COLUMBIA CAPITAL DEFENDANTS AND SERIES Y INVESTORS

40.     Columbia Capital, Inc. was and is a Delaware corporation; Columbia Capital Equity Partners II (QP), L.P., was and is a Delaware limited partnership; Columbia Equity Partners, III Q.P., L.P. was and is a  Delaware limited partnership; Columbia Cardinal Partners, LLC, was and is a Virginia limited liability company; Columbia Broadslate Partners, LLC., was and is a Delaware limited liability corporation; Columbia Capital Equity Partners III (AI), L.P., was and is a Delaware limited partnership; Lafayette Private Equities, Inc., was and is a Delaware corporation; Lafayette Investment Fund, L.P., was and is a Delaware limited partnership; Charles River Partnership X, was and is a Delaware Partnership ; Charles River Partnership X-A, was and is a Delaware partnership; Charles River Partnership X-B, was and is a Delaware partnership; Charles River Partnership X-C, was and is a Delaware partnership; N.I.G.-Broadslate, Ltd., a was and is a Cayman Islands corporation. Collectively, these defendants are referred to as "Columbia Capital" or "Series Y Investors".

41.     On or about December 24, 2001, DSL.net, Inc. ("DSL.net") entered into a Series Y preferred stock purchase agreement with Series Y Investors, relating to the sale and purchase of up to an aggregate of 15,000 shares of Series Y preferred stock of DSL.net at a purchase price of $1,000 per share. Subject to the terms and

conditions of the purchase agreement, on December 28, 2001, DSL.net sold an aggregate of 6,469 shares of Series Y preferred stock to the above-listed investors and their assignees for an aggregate purchase price of $6,469,000. The Series Y investors (or their assignees) agreed to purchase an additional 8,531 shares of Series Y preferred stock in subsequent closings.

42.     In addition, on December 28, 2001, DSL.net issued promissory notes to the Series Y investors in the aggregate principal amount of $3,531,000 in exchange for $3,531,000 in cash. The promissory notes provide for an annual interest rate of 12%.

43.     Defendant Harry Hopper served as a Director on the DSL.net Board as elected by the Columbia Capital entities.

**OTHER DEFENDANTS**

44.     Michael Sowata was president and CEO of Digitial North, a company which purchased Vector Internet Services Incorporated from DSL.net. Together with the conflicted and self-interested DSL.net Board members, they conspired to purchase the VISI assets for a fraction of the value. Defendant Sowata purchased the VISI assets for only $3.3 million, and was a self dealing transaction given the value of VISI. The transaction was not an arms length transaction, and the primary lien holder, Defendant Kleinshecht prematurely released his lien on VISI during the timeframe in which DSL.net was threatening bankruptcy.

45.     Defendant E-Trade Financial, Inc. is a Delaware corporation, through which Plaintiff Binks purchased his shares in DSL.net. Defendant E-Trade failed to

provide the stock certificates at the time of the merger and failed to deliver those shares in Plaintiff Binks' name, thereby negligently or intentionally preventing Binks from adequately perfecting his appraisal rights.

46.    Defendant Cede & Co, is a Delaware corporation who, acting for and in concert with Depository Trust Company and E-Trade Financial, was the holder of the actual shares of DSL.net that were beneficially owned by Plaintiff Binks. Defendant Cede & Co. failed to provide the stock certificates at the time of the merger in Plaintiff Binks name, thereby negligently or intentionally preventing Binks from adequately perfecting his appraisal rights.

47.    Defendant Depository Trust Company, is a New York corporation who, acting for and in concert with Cede & Co. and E-Trade Financial, was the holder of the actual shares of DSL.net that were beneficially owned by Plaintiff Binks. Defendant Depository Trust Company failed to provide all of Binks' stock certificates in Plaintiff Binks' name at the time of the merger, thereby negligently or intentionally preventing Binks from adequately perfecting his appraisal rights

## GENERAL BACKROUND

### EVENTS IN 1998

### The Board of Directors

48.    During 1998, the Board of Directors consisted of Robert Gilbertson, William J. Marshall, Paul K. Sun, and David F. Struwas.  The reporting officers at the end of the year in 1998 were Paul Sun (Chairman and Secretary) and David

Struwas (President and Treasurer).  The independent directors consisted of Robert Gilbertson, and William Marshall, who were, therefore, the members of the compensation and the audit committees.

49.    William Marshall was the cofounder of the ATM Forum, and a board member of the Securities Industries Association for Technology; from 1985-1996 was the senior, managing director and chief technology officer of the communications technology group at Bear Sterns & Co.; from 1996-1998, William Marshall was the senior advisor to Vantage Point Venture Partners; in 1998, he was promoted to a partner of Vantage Point Venture Partners.  The Plaintiff hereby alleges that it was illegal and improper for William Marshall to serve as an independent committee because, at the time, he owned 46.25 of the voting stock of the Company and, at the same time, was the managing partner of Vantage Point Venture Partners.

50.    Robert Gilbertson was President and Director of CMex from Systems from 1992-1996.  From 1996-1997 he was the Chairman of Avidia Systems; from 1997-1999 he was the director, President, and CEO of Network Computing Devices. Robert Gilberson served as a member of the DSL.net Board from January 1999 through August 2006.

51.    David Struwas became a DSL.net Board member in 1998.  He joined DSL.net as the President and CEO.  From 1997-1998, he was the general manager for Brooks Fiber Worldcom.

52.     Paul Sun was a manager of Trans Switch Corporation from 1989-1995; from 1995-1997, he was the President and Chief Executive Officer of Avidia Systems, Inc.; from1997-1998, Paul Sun was also a chief technology officer and director of PariGain Technologies, Inc.

**Illegal and Improper Events That Occurred in 1998**

53.     DSL.net filed incorporation papers with the Delaware Secretary of State on or about March 3, 1998 (File No. 2866827).

54.     On or about, September 15, 1998, the Company also acquired certain assets of Scruz.net Inc., a California Corporation, at a cost of $582,874.   Plaintiff is informed and reasonably believed that the purchase of Scruz.net was fraudulent, and that DSL.net did in fact not receive any assets for the purchase price.   Furthermore, the Company was based in Connecticut, had no network in California, and thus no reason to purchase Scruz.net, Inc.

55.     Also, the Plaintiff is informed and reasonably believes that the Company sold securities without registering those securities with the Securities Exchange Commission (Form D).   In December 1998, the Company issued 3,540,550 of common stock to two unknown officers in exchange for a promissory note totaling $7,637,000.   Of the $7 million, the Company later disclosed that $1,023,272 was for compensation to these two officers.   According to SEC filings, the only officers at that time were David Struwas and Alan A. Bolduc.   In other SEC filings, however, the only parties showing that they had 3 million shares or more

were VantagePoint Venture Partners, James D. Marver, William J. Marshall. Therefore, the Plaintiff alleges that the Company, its Board members, and major stockholders were omitting required disclosure information, issuing misleading information, and failing to properly disclose the number of shares each held.

**EVENTS OCCURING IN 1999**

56.     In 1999, DSL.net restated and amended its Articles of Incorporation a total of ten times in order to dramatically increase the number of shares in the company in order to take the company public.

57.     DSL.net paid franchise tax in 1999 in the amount of $36,877.25, amended to $36,720.46.  This franchise tax was paid on the basis of the alternative assumed capital method.  This determination is based on the issued number of shares, the par value of those shares, and the assets as reported to the Federal Internal Revenue Service, Form 1120, Schedule L, Pages 1-4.  The Company used this method to avoid disclosing the number of issued shares at the time of the Initial Public Offering.  The tax records once again indicate that the Company likely issued more shares than they disclosed.

58.     On or about October 12, 1999, the date that the Company went public, DSL.net registered 200,000,000 of common stock and 20,000,000 of preferred stock.  In April of 1999, prior to the Initial Public Offering, the Company reported total assets of $13,878,948; in July of 1999, prior to the Initial Public Offering, the Company reported total assets of $82,030,138; immediately after the IPO, in

PLAINTIFF'S COMPLAINT FOR DAMAGES

October of 1999, the Company reported $109,301,372 (57,332,871 shares issued); and at the end of the year, they reported $117,631,772 (58,382,196 shares issued). The IPO share price was $7.50 and the Company issued 7,200,000 shares. Therefore, the Company should have raised approximately $54,000,000, yet the reported assets reflect only an increase of approximately $27,000.000.   Where did the money from the IPO go?

59.   The Board of Directors, during 1999, consisted of Robert Gilbertson, William Marshall, Paul K. Sun, and David F. Struwas, James D. Marver, and William Seifert. .  The reporting officers at the end of the year in 1999 were David Struwas (CEO) and Steven Zamasky (Vice-President).

**EVENTS OCCURING IN 2000**

60.   In 2000, DSL.net's franchise tax was $130,000, and reported, at the end of the year, total gross assets of $194,805,918.  The Company used the standard method of reporting instead of the assumed capital method.  The Company had issued 66,002,820 of common stock and no shares of preferred stock.  The designation of stock remained 200,000,000 of common stock and 20,000,000 shares of preferred stock 5,750,000 at a price of $26, netting an estimated $144,000,000.

61.   The Board of Directors, during 2000, consisted of Robert Gilbertson, William Marshall, Paul K. Sun, and David F. Struwas, James D. Marver, and William Seifert. .  The reporting officers at the end of the year in 2001 were David Struwas (CEO) and Steven Zamasky (Vice-President).

**EVENTS OCCURING IN 2001**

62.     Once DSL.net, through its Board of Directors, raised the money it needed to pull off the scheme alleged, the Board began to dismantle and loot the Company.  The actions were so egregious that the Delaware Franchise Tax Board questioned the Company's accounting.

63.     In 2001, DSL.net's franchise tax was $150,000, and reported, at the end of the year, total gross assets of $81,514,272.  The number of shares designated at the end of the year remained 200,000,000 in common stock and 20,000,000 shares of preferred stock.  The number of shares DSL.net issued to the public was 64,851,462 of common stock.  This meant there was a reduction of over a million shares issued from the previous year.  In addition, during 2001, the Company issued 35,000 shares of preferred stock.  The assets of the company, at the end of the year, totaled $81,514,272.  This represented  a $113,329,646 reduction of  working capital and assets of the company from the close of business in 2001.

64.     DSL.net was supposed to pay $150,000 in franchise tax, but only paid $19,017.90.  The Company took a deduction of $113,329,646 in assets, resulting in a credit of $132,730.  This prompted an inquiry by the Delaware Secretary of State about the credit and the drastic decrease in capital and assets of the Company.  In a letter dated June 24, 2002 from the Delaware Franchise Tax Board requesting DSL.net's taxes, the Company promised to send the Delaware Franchise Tax Board

its Federal Taxes.  DSL.net never provided its Federal Taxes as it was requested to do so in this letter dated June 24, 2002.  The letter contradicts DSL.net's filing of its 10K year end report filed on March 29, 2002, which is two months before the June 24, 2002 letter.  This only proves that DSL.net was filing their year end 10K with the SEC with no record date of filing their taxes with the Internal Revenue Service and State Franchise Tax Board.  Plaintiff Binks alleges that these actions are fraudulent and DSL.net never provided its Federal taxes which plaintiff believes needs to be investigated.

65.     In November of 2001, the Board amended the Articles of Incorporation, and designated a new series of stock, the Series X preferred convertible stock.  The allowance of the Series X transaction by the Board demonstrated gross negligence on their part because just a little over a year prior, DLS.net had a secondary offering and issued 5,750,000 shares and received over $144 million in working capital.  If one were to compare the number of shares to the money received in this secondary offering to that of the new Series X stock, the Board breached its fiduciary duty by allowing the 20,000 Preferred Series X shares to be issued for $20 million.  These 20,000 shares were convertible to 111,111,111 shares of common stock upon the triggering of certain events, namely if the stock price exceeded $2 a share, a transfer of control of the company, or a winding up of the Company.  More importantly, the Series X shares, in total, had the voting rights of 111,111,111 shares.

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

66.    Additionally, these preferred shares were entitled to a $120 per year of accrued dividends, which equates to $2,400,000 a year. These Preferred shares were only offered to and purchased by VantagePoint, its subsidiaries, affiliates, and general partners, who had the inside information of the scheme to loot the company. Plaintiff alleges that the Series X stock was self-dealt to VantagePoint, and VantagePoint only.   A non-conflicted Board would never have allowed this type of transaction, and instead, would have opted for another secondary offering because the market value on the date of the issuance of the Series X Preferred stock exceeded $120 million.  To allow these shares that could have gained the company approximately $120 million for a mere $20 million was a breach of fiduciary by the Board.

67.    Furthermore, the issuance of the Series X Preferred stock was a mechanism (1) to defraud the stockholders and to increase the amount of shares available to the Company in a plan to effect a short form merger pursuant to Section 253 of the Delaware General Corporate Law, which Defendants violated, (2) to give VantagePoint the voting power of the Company and control of its operations, and (3)  to issue dividends in violation of Delaware General Law and DSL.net's Articles of Incorporation and Charter.  This self-dealing transaction of the Series X preferred stock gave VantagePoint the right to elect the majority of the Board of Directors and take control of DSL.net for their own benefit.

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

68.   Plaintiff is informed and believes, and thereupon alleges that Defendants Marver and Salzman and their VantagePoint entities had insider information before the issuance of the Series X Preferred Stock.  These Defendants also shorted/hedged DSL.net's capital stock when it was at a price of $26 per share or more.

69.   Furthermore, Defendant Salzman was required to file SEC Section 16 Forms 3, 4, and 5, and was / is in violation of  SEC, Section 10(5)(b) for failing to report his true and correct ownership of DSL.net.   Defendant Salzman failed to disclose his direct ownership position as Managing and/or General Partner of VantagePoint Venture Partners  III LP.  Defendant Salzman was in fact the Managing Member of VantagePoint Venture Partners III LP, which was signed by Salzman on a date after the Initial Public Offering.  However, Defendant Salzman attempted to disguise his General and or Managing Partner status of this entity by a signed a Form D for VantagePoint Venture Partners III LP by reporting that VantagePoint Venture Partners III, LLC was the Managing Member of this entity, when in fact, Defendant Salzman was the Managing Partner of this entity.  This deceitful reporting was done for the purpose of hiding Defendant Salzman's true ownership of VantagePoint Venture Partners III LP, the VantagePoint entity which benefited Salman multi-millions of dollars, and the entity in which most of the money ran through.  Additionally, VantagePoint Venture Partners III LP is missing SEC Form 3's, Form 4's and Form 5's.

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

70.     Ultimately, through this planned out scheme, the Company was stolen from the stockholders by driving the stock price down to next to nothing, while these Defendants were cashing in on millions of dollars.   Allowing this Series X Preferred transaction to occur was gross negligence and a breach of fiduciary duty on behalf of the Board of DSL.net.   The general partners / board members who benefited from this transaction included, but are not limited to, Defendants Marshall, Marver, and Salzman.   The entire transaction was self-dealing given that the VantagePoint Defendants and related entities, and general partners (Marshall, Marver, and Salzman), controlled the Board of DSL.net and voted to approve the transaction. Plaintiff alleges the Board breached its fiduciary duty for this gross negligence of the officers, directors and controlling stockholders of DSL.net.

71.     In December of 2001, the Board amended the Articles of Incorporation, and designated another new stock, the Series Y preferred convertible stock.  The amount of the Series Y shares that were issued was 15,000 shares at a cost of $15,000,000 ($1000 each, the same as the Series X).  However, these shares were convertible to only 30,000 shares of common stock upon the occurrence of certain events, which again, was the stock price exceeding $2 a share, a transfer of control, or a winding up of the company. Furthermore, the Series X shares, in total, had the voting rights of the 111,111,111 shares.  At the time of the issuance of the Preferred Series X and Y shares, the Board duly met and submitted a voting agreement with the Securities and Exchange Commission that would require the Series Y shares to

vote in line with the Series X vote, therefore, the Series Y stock did not have a right to elect a Board member; instead, the Series X shares had a right to elect a Board member to represent the Series Y shareholders. These shares were entitled to a $120 per year of an accrued dividend, which equates to $1,800,000 a year. These shares were only offered to and purchased by Columbia Capital, its subsidiaries, and entities in their scheme alleged.

**Other Illegal and Improper Events That Occurred in 2001**

72.    Defendant William J. Marshall has served as an independent director of DSL.net and as a partner of VantagePoint. Defendant Marshall's independence as a director of DSL.net is in violation of Rule 4200 of the National Association of Securities Dealers' listing standards.   Defendant Marshall held the position as an independent director and was assigned to the DSL.net audit committee. This audit committee consisting of Defendant Gilbertson, Defendant Marshall, and William Seifert met six times in 2001. Of these six meetings, three were with the company's elected and designated accounting firm, PriceWaterhouseCoopers, LLP.   At these special meetings, Defendant Marshall's actions were to fraudulently coerce, manipulate or mislead the Company's independent auditors in their performance of an audit of the Company's financial statements. Defendant Marshall gave misleading material to the accounting firm which resulted in DSL.net receiving a $113 million restructuring reduction of DSL.net's capital and assets. Defendant Marshall provided these fraudulent documents to the auditor in a well thought out

scheme arranged by Defendants Marshall, Salzman, Marver, and Karbanda who had a financial motive to manipulate, and influence the auditor.  This misleading information resulted in an annual audit report requesting a $113 million restructuring reduction of DSL.net's capital assets.   Defendant Marshall is in violation of Federal and State laws, Section 303 of the National Association of Stock Dealers and is also in violation of Section 16 requirements of the S.E.C. Act.

73.    Defendant Marshall did not accurately report his beneficial ownership in DSL.net.   In addition, an analysis of Section 14(a) of DSL.net's published proxy statements shows that Defendant Marshall submitted material facts that were misleading and omitted information to defraud stockholders. These actions by Defendant Marshall are a violation of Section 10(5)(b) of the S.E.C Act as amended .  Additionally, Plaintiff is informed and believes that some of Defendant Marshall's beneficial ownership forms are forged.

74.    Defendant Marshall was improperly meeting with PriceWaterhouseCoopers, LLP during DSL.net's audit period and recommending and influencing them by requesting that the auditors approval a $113 million restructuring of DSL.net capital assets and requesting that PriceWaterhouseCoopers LLP post these fraudulent audited financial statements in the Company's annual report on the Form 10-K for the fiscal year ending December 31, 2001.  Once again, the Delaware Secretary of State inquired about DSL.net's request for a $113 million credit and the drastic decrease of  DSL.net's assets.  DSL.net's promise to send its Federal taxes to the

Delaware Franchise Tax Board never materialized.   In the SEC filing in 2001, under Note 15, PriceWaterhouseCoopers, LLP. did not agree with the dates that were posted in the 10K filed on December 31, 2001.

75.    Additionally, at this time, Defendant Marshall did not disclose the fact that he was starting a direct competitive private telecommunications company named CBeyond, Inc. that was incorporated under the laws of the State of Texas and Georgia.   Plaintiff Binks believes other defendants, directors,  officers and controlling stockholders of DSL.net failed to disclose their activity and interest with CBeyond which had coincidently raised $140 million in working capital during the same month in which DSL.net raised $144 million in their secondary offering. Defendant Marshall abused his position as an independent director by giving false and misleading information and requesting that the auditors submit such fraudulent accounting and for the aiding in the fraudulent restructuring of DSL.net's operations at a cost of $113 million.

76.    Also, as noted above, DSL.net and VantagePoint were in violation of Federal and State laws by sending out letters to discontinue DSL.net's customers' service in 22 states, and by issuing misleading information in the definitive proxy statement pursuant to Section 14A of the Securities Exchange Act of 1934.   Defendants Salzman, Marver, Marshall, Kharbanda,  and Yageman all failed to disclose of their activity with a direct competitor, CBeyond.

PLAINTIFF'S COMPLAINT FOR DAMAGES

77.    To elaborate on this restructuring, in June 2001 and on September 30, 2001, the Board which was controlled by VantagePoint made decisions to reduce its operating losses and made reductions in its operating expenses.  There was a closure of 350 central offices/data centers.  These central office/data centers are where the customers are connected to their internet provider, DSL.net.  The company said it cost $26,078,000 to close the data centers where the equipment and the customers were connected.  On the annual reports filed with the Secretary of State and Department of Corporations in the state of Delaware, it shows a charge of $2,545,000 to remove the equipment and a $23,533,000 write off for fixed assets taken by DSL.net.  Plaintiff believes and alleges that defendants were selling and or migrating the assets for their personal gain.

78.    Additionally, during this period, the Board made another decision, because of the limited available financing of the company's finances, and determined additional actions were required in the restructuring which included the closure of Tycho Networks in California and Trusted Net in Marietta, GA.  Both companies were internet providers owned by DSL.net. (DSL.net had just purchased Trusted Net only 15 months earlier for $2.5 million and assumed its debt of $2,650,000 for a total purchase price of $5,150,000).    On July 20, 2001, DSL.net requested approval of the Federal Communication Commission ("FCC") and the State Public Utilities Commissions ("PUC") through Section 214, informing its customers of discontinuance of service.  These requests to the FCC and State PUC's to cancel

customers were submitted in the states of Arkansas, California, Florida, Georgia, Indiana, Iowa, Idaho, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New York, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, and Texas. This letter also informed the FCC and State PUC's that DSL.net was also locating and identifying alternative providers that would be able to provide communication service to these customers. These alternative providers that DSL.net mentioned were private companies in which the directors, officers, and controlling stockholders were affiliated. The defendants knew these customers were valuable and could have very easily been sold.

79.     During this reorganization and customer migration, DSL.net purchased Vector Internet Services Inc. ("VISI") for approximately $30 million. VISI was sold to Defendant Sowata in a rush at the tax year ending 2005 for $3.3 million in a cash deal. Plaintiff is informed and believes that there is no accounting record of this cash deposit for the sale of VISI. (After being sold, for the fiscal year ending 2007, VISI reported revenues in the amount of $28 million with 35 employees with $800,000 yearly revenue per employee). When VISI was sold, DSL.net submitted revenues of $7 million with the same number of employees. Plaintiff alleges that DSL.net gave misleading information regarding VISI's revenues and VISI's synergy for the purpose of excluding VISI from the merger. In addition, it is very suspect that Defendant Kleinknecht would release his lien of $3.3 million on VISI without securing any assets of DSL.net. It is not a wise business move to release a lien on a

company that is threatening Bankruptcy unless you had insider information. Defendant Kleinknecht did in fact have that insider information and knew he would be receiving a great sum of money through his the nine month financing, which again, was a part of the scheme alleged.   (Defendant Kleinknecht through his predatory financing transaction received an approximate 18% interest rate).

80.     During this reorganization period in which DSL.net reorganized its operations and business plan and requested a credit of $113,329,646 with the Franchise Tax Board, DSL.net reported assets of $194,805,918 in 2000 and paid a franchise tax of $130,000.  In 2002, DSL.net reported assets of $81, 514,272).

81.     During a 2001 Michigan PUC deposition with Julia Oh Strow, the representative of the newly formed internet company CBeyond, Julia Oh Strow requested the approval for CBeyond to operate as an internet service provider and presented a list of its officers and directors to the Michigan PUC, which included Michael Yageman (managing director of VantagePoint Venture Partners).  While this deposition that was done in 2001 stated that Yageman was a managing director of VantagePoint Venture Partners, DSL.net stated Yagemann served as a director of VantagePoint since February 2003 and partner of VantagePoint since 2001. DSL.net did not disclose Defendant Yageman's interest whatsoever with the competitor, CBeyond.

82.     The Board of Directors, during 2001, consisted of Robert Gilbertson, William Marshall, Paul J. Keeler, and David F. Struwas, James D. Marver, and

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

William Seifert.  It also appears that Paul J. Keeler improperly began voting on the Board of Directors, without ever being elected.  The reporting officers at the end of the year in 2001 were David Struwas (CEO) and Steven Zamasky (Secretary).

**EVENTS OCCURING IN 2002**

**The Board of Directors**

83.     During 2002, the Board of Directors consisted of Robert Gilbertson, William J. Marshall, Paul Keeler, David F. Struwas, James D. Marver, and Hopper. The reporting officers at the end of the year in 1998 were Steven Zamansky (Vice President and General Counsel) and David Struwas (Chief Executive Officer).

**Events That Occurred in 2002**

84.     On or about September 5, 2002, the Board elected to increase the number of directors from 7 to 8; however, according to proxies earlier in the year, the Company already had 8 directors.  The holders of the Series X stock (Defendants VANTAGE POINT VENTURE PARTNERS, MARVER, SALZMAN, and MARSHALL), voting as a separate series, had an emergency vote to gain a majority of the total number of directors.  By unanimous written consent, in lieu of a special meeting, the Series X shareholders elected Kenneth S. Kharbanda, an affiliate and partner of Vantage Point Venture Partners, as a director of DSL.net. The directors at that time were Defendants Struwas, Gilbertson, Harnett, Hopper, Keeler, Marshall, and Marver.

85.     There were three major problems with Kharbanda's election. First, public filings shows that the Board of Directors already consisted of eight members, but the DSL.net  Board claims it was voting to increase the number from seven to eight; second, the number of directors subsequent to Kharbanda's election was nine, when the DSL.net Charter only permitted a maximum of 8 directors; and finally, Kharbanda was an officer and director of, CBeyond, Inc., a direct competitor to DSL.net.

86.     During 2002, both Kharbanda and Marshall were directors and officers of CBeyond, Inc., a direct competitor to DSL.net.  Kharbanda registered with the SEC (Form D) to sell securities for CBeyond, and represented Vantage Point Venture Partners in the offering.  None of this information was disclosed.  Marshall was also a CBeyond board members during this period, making his appointment and decisions as a DSL.net Director conflicted.

87.     Almost immediately subsequent to the placement of Kharbanda on the Board, the Board voted to approve the purchase of Network Access Solutions (hereinafter referred to as "NAS") from the bankruptcy court.  NAS was a DSL.net services provider and was a direct competitor to DSL.net.  NAS filed an application with the FCC to transfer its assets to DSL.net on October 16, 2002 (File No. W-02-329).  The application sought a Rule 214 authorization transfer of control of assets from NAS and its entities, Brian P. Applegate of Spectrum Equity Investors (31% owner), and Jonathan P. Aust (14% owner), license FRN0004356226, to DSL.net

Communications, LLC., DSL.net Virginia, DSL.net, Inc., and Vantage Point Venture Partners (a 71% owner), license FRN0004324581.  NAS reported $75 million dollars in assets; however, DSL.net purchased the NAS for $7 million in cash, and an assumption of $10 million in debt.

88.  For the year ending in 2001, DSL.net reported assets of $81,514,272. For the year ending in 2002, however, they reported assets of only $53,495,943. This was despite the fact that DSL.net purchased NAS for only $17 million, and NAS assets were approximately $75 million.  Why did DSL.net's assets not reflect the acquisition of NAS, but instead dropped substantially? The total drop in assets between 2001 and 2002 was $28,018,329, when the Company had just received $75 million in assets.

89.  It should also be noted that NAS received $13 million dollars from Lucent Technologies, Inc. from an arbitration award of October 18, 2002.  As part of the award, NAS also was relieved of any and all financial obligations to Lucent (conservatively valued at $800,000).  Because DSL.net owned NAS, that money should have been reflected in the Company's accounting.  The Plaintiff is informed and there upon alleges that once again, that money does not appear anywhere on the Company's books.

90.  From January 1, 2002 to May 29, 2002, DSL.net reported to the Delaware Franchise Tax Board that there were 200,000,000 shares of common stock and 20,000,000 of preferred stock.  The number of issued shares were 65,306,999 and

reported assets of $61,306,999.  On May 29, 2002, at the shareholder meeting, the shareholders approved the amendment to the Certificate of Incorporation, and reported 400,000,000 of common shares and 20,000,000 of preferred stock.  On May 29, 2002, the Company reported 64,949,899 of issued shares, and reported assets of only $53,495,943 at the end of the year.   During the reporting period of 2002, DSL.net made two entries.  These two entries showed a reduction of issues shares of over 350,000 and of assets of almost $8,000,000.  The Delaware franchise tax for 2002 was 150,000, although the Company only paid $56,211.84 because of a credit of over $96,000.

91.    The Board of Directors, during 2002, consisted of Robert Gilbertson, William Marshall, Paul J. Keeler, and David F. Struwas, James D. Marver, and Harry Hopper. The reporting officers at the end of the year in 2002 were David Struwas (CEO) and Robert Desantis (CFO).

92.    During the year of 2002, the transactions that took place to amend the Articles of Incorporation and at the stockholder meetings are as follows:  On or about May 27, 2002, the Board proposed an amendment to the Company's Amended Certificate of Incorporation, for shareholder approval, the following items:  (1) to increase the class of stock from 200,000,000 to 400,000,000 (replacing Paragraph A, Article IV) and keep 20,000,000 as preferred stock; (2) no shareholders of stock may take action by written consent in lieu of a meeting, except for Series X and Series Y shareholders; (3) granting the Series X preference to the

distribution of any assets in the event of any liquidation; (4) increasing the automatic conversion price of the common stock from $2.00 per share to $2.50 (as required under the NASDAQ); (5) that as long as 25% of the Series X remained outstanding, the Company could not issue any security senior to or equal to the Series X or alter any privileges of the Series X; (6) that after January 1, 2005, the Series X majority shareholders may demand the company redeem the Series X shares; and (7) the mechanics for redeeming the Series X shares.

93.    All these provisions made certain that DSL.net could never become superior to the Series X shareholders, even should it purchase back up to 75% of the Series X shares (as stated in Sec. 5 of the Series X certificate designation).  It effectively gave control of the Company with only 28,000,000 shares of common stock.  These was a breach of fiduciary duty by the DSL.net  Board members.

94.    At a sham shareholder meeting on March 29, 2002, the shareholders voted to amend the Certificate of Incorporation in the following ways:  (1) elect three Board members; (2) to issue an additional 8,531 Series Y preferred shares; (3) to increase the amount of common stock to 400,000,000 from 200,000,000 as proposed by the Board and the capital stock from 220,000,000 to 420,000,000; (4) that preferred stock holder may act by written consent (but not common stock holders); (5) Series X rank on parity with Series Y, increase the automatic conversion from $2,00 to $2.50, (6) eliminate the requirement that DSL.net obtain a majority shareholder vote of Series X stockholders to issue in preference to Series

X; (7) to approve the Stock Option and Incentive Plan; and (8) to ratify PriceWaterhouseCooper as the auditors. The shareholder meeting was sham because no matter how the individual shareholders voted, Defendants VPVP and its entities were controlling shareholders and railroaded the vote.

**EVENTS OCCURING IN 2003**

95.    From January 1, 2003 to October 10, 2003, DSL.net reported to the Delaware Franchise Tax Board that there were 400,000,000 shares of common stock and 20,000,000 of preferred stock. The number of issued shares were 95,179,736 (an increase of 30,229,837 from 2002) and reported assets of $59,060,562. At the end of the year, the Company reported that there were 800,000,000 shares of common stock and 20,000,000 of preferred stock. This dilution was due to Defendant Series X (VPVP and its entities) and Series Y (Columbia Capital and its entities) Preferred Stockholders self-dealing, self-interested transaction. At the end of the year, of issued shares of 144,119,859 (an increase of 48,940,223), and reported assets of only $59,060,562 at the end of the year. The amount of assets did not increase from October 2003, despite receiving, at a minimum, a $30,000,000 investment. The Delaware Franchise tax was $165,000,000, but the Company only paid $17,421.13.

96.    The Board of Directors met in July and August of 2003 and voted to propose amendments to the Articles of Incorporation for shareholder approval in the following manner. First, the proposed increasing the amount of common stock

shares from 400,000,000 to 800,000,000. Second, to amend the Series X shares to adjust the price upon issuance of the common stock upon conversion of the Series X to common stock. Third, the issuance of common stock to employees would not affect the conversion price of the Series X shares. Fourth, the Board proposed changing the optional redemption date of the Series X shares to July 18, 2006 (but did not revise the requirement that 25% shares of Series X could trump DSL.net). Fifth, the Series Y changed the conversion price from 50 cents per share to 44.23 cents. Sixth, both the Series X and Y shares conversion price would adjust should the company (thereby guaranteeing a value of in the preferred shares because the shares would adjust to the market price). Seventh, the issuance of common stock to employees would not affect the conversion price of the Series X or Y shares. Eighth, the Board proposed changing the optional redemption date of the Series Y shares to July 18, 2006.

97.    On July 17, 2003, the Board duly met and adopted a resolution to increase the number of shares from 400,000,000 to 800,000,000. This increase in the number of shares was approved by the self-dealing Board of directors and controlling stockholders and was meant solely for the purpose of accommodating the Series X and Series Y and Z Preferred shares and to make available to these stockholders shares of the corporation when the Series X and Y and Z shares converted the preferred shares in to common shares. Based on Delaware law, the Board of Directors may only amend the Articles of Incorporation to increase the number of

shares in a corporation for single, predetermined event.   On or about November 3, 2005, the holders of the preferred Series X, Y and Z shares accepted payment and all of their outstanding shares were cancelled.  Delaware law then required that the Board of Directors then reduce the number of stock authorized to the Company because the event that caused the increase of the number of shares in the company had occurred and cancelled.   The responsibility and the fiduciary duty of the Board after November 3, 2005 was to duly meet and propose an amendment, for shareholder approval, to the Certificate of Incorporation to reduce the class of issued common stock from 800,000,000 back to 400,000,000, and to reflect a responsible amount based on the number of issued shares.  In 2006, the Company reported 239,020,817 issued shares.  The Board should have proposed reducing the number of authorized stock accordingly, and submit the amendment to the shareholders within thirty days.  If the Board had acted responsibly and according to its fiduciary duty, 500,000,000 shares of authorized stock would have been eliminated and preserved the stockholder equity in the Company.

**The Series X and Y Preferred Stock Dividend Provisions and the Illegal Transfer of Control Application.**

98.     Pursuant to the terms of the issuance of the Series Y shares, certain criteria had to be met before the issuance of dividends. Specifically, the provisions of the Series Y shares were:

"The holders of shares of Series Y Preferred Stock shall be entitled to receive dividends out of funds legally available therefore, in cash or, at the sole option of the Corporation, but only in case of a dividend payment under clause (ii) below, in shares of the Corporation's common stock, par value $.0005 per share (the "Common Stock"), measured at the fair market value of the Common Stock at the time the dividend is declared, prior and in preference to any declaration or payment of any dividend (payable other than in Common Stock or other securities and rights convertible into or entitling the holder thereof to receive, directly or indirectly, additional shares of Common Stock) on the Common Stock, at the rate of $120 per share per annum (the "Accruing Dividends") (as adjusted for any stock splits, stock dividends, recapitalizations or the like affecting the Series Y Preferred: Stock after the date of the filing of this Designation of Series Y Convertible Preferred Stock (the "Series Y Certificate of Designation") with the Secretary of State of the State of Delaware), when and if declared by the Board of Directors. Accruing Dividends shall accrue on a monthly basis on each share of the Series Y Preferred Stock from the date of original issuance of such share, whether or not earned or declared and shall be cumulative. Notwithstanding the foregoing, accrued but unpaid dividends shall be paid on each outstanding share of the Series Y Preferred Stock upon the earliest to occur of (i) any liquidation, dissolution, winding up or Change of Control (as defined in subsection 2(c)(i)), which payment shall be made as provided in Section 2; (ii) any conversion of such share of the Series Y Preferred Stock into

Common Stock; or (iii) any redemption of such share of the Series Y Preferred Stock, which payment shall be made as provided in Section 6. The holders of a majority of the then outstanding shares of Series Y Preferred Stock may waive any dividend or dividend preference that such holders shall be entitled to receive under this Section 1 by giving the Corporation written notice of such waiver. For the purpose of this Section 1, "fair market value" shall be determined in accordance with Section 2(c)(ii) hereof."

99.     Despite the fact that none of these provisions were met, the holders of the Series X and Y Preferred Stock, in violation of Delaware Corporate Law §§ 160, 173, and 174, issued themselves shares in lieu of the payment of dividends (dividends to which they were not entitled).  The Board of DSL.net  failed to stop the Series X and Y Defendant Shareholders, failed to file an injunction to prevent the illegal issuance and dilution of DLS.net's stock, and failed to act to protect the stockholders from this illegal issuance of share in lieu of dividends.

100.    The issuance of these dividends was done through a fraudulent "transfer of control" of DSL.net.  The Series X and Y stockholders provided false, fraudulent, misleading, and incomplete information to defraud DSL.net stockholders and the Federal Communications Commission.  On or about September 17, 2003, Defendant VANTAGE POINT VENTURE PARTNERS (and its related entities and subsidiaries), the Series X Preferred Stock shareholders, filed a Transfer of Control Application (DA 03-3395) under Domestic Section 214, 63.03 and 63.04

of the FCC Commission's Rules.  This Transfer of Control Application requested authority for VPVP to relinquish indirect majority control of DSL.net as a result of a series of transactions through which Defendant DEUTSCHE BANK AG LONDON might obtain a minority interest of DSL.net.  The Application was fraudulent because the DEUTSCHE BANK AG LONDON transaction of July 18, 2003, resulted only in the right of DEUTSCHE BANK to exercise an option to purchase 12,950,000 shares of common stock and warrants to purchase 105,471,053 shares (December 9, 2003 Warrant) and 14,357,249 shares (October 7, 2004 warrant) of common stock.  The proposed application for the transfer of control stated that the transfer of control MAY result in VPVP's ownership failing below fifty percent.  A transfer of control would have only been proper had DEUTSCHE BANK exercised their right to purchase the shares in the stock and warrant purchase agreements, but because DEUTSCHE BANK AG LONDON never exercised those rights, VPVP remained a majority shareholder and the application with the FCC was fraudulent. Beyond being a mere oversight, Plaintiff is informed and believes that VPVP and DEUTSCHE BANK AG LONDON were knowingly and intentionally defrauded the DSL.net stockholders, including Plaintiff Binks, and the FCC.

101.   This Transfer of Control Application was simply a mechanism to trigger the issuance of dividends to the Series X and Y Preferred Stock shareholders, namely the VPVP and its related entities (the Series X Stockholder), and Columbia Capital  and its related entities (the Series Y Stockholder).  This fraudulent

triggering of the dividend mechanism resulted in the conversion of the Series X and Y Preferred Stock to over 175 million shares of DSL.net common stock, thus diluting stockholder equity and devaluing DSL.net.  Plaintiff is informed and believes that the Series X and Y Preferred Stockholders realized a gain of over $194 million dollars for a mere $35 million dollar investment.  DSL.net filings state that, "During the third and fourth quarters of 2003, the Series Y Investors converted 14,000 shares of Series Y Preferred Stock into 35,140,012 shares of the Company's common stock (including shares of common stock issued in lieu of cash to pay accrued dividends on the Series Y Preferred Stock)."  Conveniently and fraudulently, the Series Y investors fail to disclose the date or stock price for when it illegally converted the shares.  Therefore, not only were the issuance of the shares illegal and fraudulent, but the way in which they self-dealt themselves the dividend was improper as no one is able to determine the exact number of shares the Series Y shareholders were allegedly entitled to since no date was given.

102.   The fraudulent application was the method for which these Companies illegally and fraudulently triggered the payment of the dividends.  The payment of these dividends damaged Plaintiff Binks by diluting the value of DSL.net's stock, and was the mechanism that ultimately caused DSL.net to become a Company of "going concern" and ripe for a take-over.  Furthermore, the issuance of the dividends was completely self-dealing and without Board approval.  Also, the Board

of Directors failed to oversee the issuance of these dividends and turned a blind eye to the self-dealing, fraudulent dividend transaction.

103.   Furthermore, upon the issuance of the illegal dividends, the Series X and Y Preferred Stock holders failed to disclose the date of the issuance of the dividends or the price of the stock at the time that the dividends were issued. Accordingly, Plaintiff Bink is informed and believes that the amount of dividends these entities dealt themselves was exorbitant.  All this was done in violation of Delaware Corporate Law, DSL.net's Charter and Articles of Incorporation).

104.   The Board of Directors and the self-interested, individuals Directors and controlling stockholders, including, but not limited to, Defendants MARSHALL, MARVER, HOPPER, SALZMAN, and PICKLE, used the fraudulent transfer of control and dispersment of the illegal dividends as an excuse to vote to increase the number of shares of DSL.net from 400,000,000 to 800,000,000. Ultimately this was simply a scheme by the self-interested, individual Directors, officers and controlling stockholders to consummate a self-dealing merger with Defendants MDS Acquisitions / MegaPath, Inc.  Instead of using the increased number of shares to pay accommodate the Series X and Y Preferred Stock shareholders, the Board ultimately used these shares to facilitate the self-dealing merger with Defendants MDS Acquisitions / MegaPath, Inc.

105.   The Board of Directors, during 2003, consisted of Robert Gilbertson, William Marshall, Paul J. Keeler, James D. Marver, Michael Yagerman, and Robert Hartnett.

The reporting officers at the end of the year in 2003 were Kirby Pickle and Walter Keisch.  Kirby Pickle was fraudulently reported as the CEO, despite the fact that Pickle did not come to the Company until 2004.  These officers and directors breached their fiduciary duties by turning a blind eye to the self-dealing, fraudulent, destructive issuance of the dividends to themselves by the Series X and Y Stockholders, and failing to stop this fraudulent transaction.

**EVENTS OCCURRING IN 2004**

106.  At the end of the year, DSL.net reported to the Delaware Franchise Tax Board that there were 800,000,000 shares of common stock and 20,000,000 of preferred stock.  The number of issued shares were 233,619,817 (an increase of 89,501,958 issued shares from 2003) and reported assets of $40,862,499 (a reduction of $18,198,063 of assets from the end of the year in 2003).  The Delaware Franchise tax was $36,000, but the Company paid $123,708.92.

107.  The Board of Director met in July 2004 and voted to issue a new series of preferred stock designated as Series Z shares.  This stock was a total of 14,000 shares, had no dividend privileges, had no right to elect board members .

108.   The Board of Directors, during 2004, consisted of Robert Gilbertson, William Marshall, Paul J. Keeler, James D. Marver, Robert Hartnett, and Duncan Davidson.  The reporting officers at the end of the year in 2004 were Kirby Pickle and Keith Markley.

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

## EVENTS OCCURING IN 2005

109.   At the end of the 2005 year, DSL.net reported to the Delaware Franchise Tax Board that there were 800,000,000 shares of common stock and 20,000,000 of preferred stock.  The number of issued shares were 233,620,817 (an increase of 1,000 issued shares from 2004) and reported assets of $23,038,173 (a reduction of $17,824,326 of assets from the end of the year in 2004).  The Delaware Franchise tax was $20,250.00, and the Company paid $20,250.00.

110.   The Board of Directors, during 2005, consisted of Robert Gilbertson, Keir Kleinknecht, Paul J. Keeler, David Struwas, and Robert Hartnett.  The reporting officers at the end of the year in 2005 were David Struwas and Walter Keisch.

111.   At the shareholder meeting, the following items were approved:  (1) to elect one member of the board to serve as a class one director; (2) to approve a warrant to purchase up to an aggregate 19,143,000 shares of common stock; and (3) to increase the number of shares that could be paid for the employee stock option plan from 20,000,000 shares to 65,000,000 and to increase the amount payable to a single employee from 5,000,000 to 8,000,000.  The warrant to purchase 19,143,000 shares was to pay Vantage Point Venture Partners and Deutsche Bank to subordinate their interests as preferred stock holders to the Laurus Bank Note filed on November 5, 2004 on an S-3 registration statement with the SEC.

**The Pickle Severance:**

112.   Pursuant to Pickle's termination of employment, this triggered severance benefits that were in violation of DSL.net's Articles of Incorporation, Charter, and Pickle's fiduciary obligations.  First, Pickle violated the non-compete clause in his employment contract by going to work for KMC Data as Chairman and officer. Second, during his time at DSL.net, he amended his own contract in a self-interested transaction by amending the Company's foreign corporation status with the various states.  Thereby, Pickle evaded paying federal and state income taxes, and essentially caused DSL.net to pay his taxes. Third, he received a bonus of $350,000 for the DunKnight Transaction, when, in fact, Pickle did not actually extend the Company's financing obligations through the DunKnight financing, but actually, increased the Company's going concern by charging 46% interest to DSL.net for a nine month period of financing.  In all essence the $4 million that was to be assigned to DSL.net for working capital was actually $4.6 million paid to the DunKnight entities.

**Conflict of Interest By Struwas**

113.   During his time at DSL.net, Plaintiff is informed and believes that, at the same time, Defendant Struwas held a position with a competitor of DSL.net's. Specifically, Defendant Struwas was the CEO and a director of DSL.net.  Internet, a privately held telecommunications company owned and operated by Defendant Kleinknecht.  Furthermore, Plaintiff Binks is informed and believes that Defendants Struwas and Kleinknecht were migrating billing, assets and customers from DSL.net

to DSL.net Internet.  The Florida Public Utilities Commission investigated

Defendants Struwas and Kleinknecht (Docket No. 04-1205-TX) for these illegal

activities.

**EVENTS OCCURING IN 2006**

114.   At the end of the 2006 year, DSL.net reported to the Delaware Franchise Tax

Board that there were 800,000,000 shares of common stock and 20,000,000 of

preferred stock.  The number of issued and available to the public was  239,020,817

(an increase of 5,400,000 issued shares from 2005) and reported assets of

$11,808,780 (a reduction of $11,229,393 of assets from the end of the year in 2005).

The Delaware Franchise tax was $0, and the Company paid $0.

115.   On August 18, 2006 and August 25, 2006, the Board of Directors duly

met and approved to amend the Articles of Incorporation of DSL.net and submit

their approval to the shareholders for a vote. The first amendment to Articles of

Incorporation was to increase the number of shares of common stock from

800,000,000 to 4,000,000,000 (4 billion) and to keep the number of preferred stock

at 20,000,000.  This was an increase of 3,200,000,000 of common stock.

116.   On July 17, 2003, the Board duly met and adopted a resolution to

increase the number of shares from 400,000,000 to 800,000,000.   Based on

Delaware law, the Board of Directors may only amend the Articles of Incorporation

to increase the number of shares in a corporation for single, predetermined event. In

this instance, the DSL.net  Board stated that the increase in the number of shares

was necessary to accommodate the Series X and Series Y and Series Z Preferred shareholders so that these preferred stockholders could convert the preferred shares in to common shares upon a triggering event.

117.   On or about November 3, 2005, the holders of the preferred Series X, Y and Z shares accepted payment and all of their outstanding shares were cancelled. Delaware law then required that the Board of Directors reduce the number of shares authorized to the Company since the event that caused the increase of the number of shares in the company had occurred and cancelled.   The responsibility and the fiduciary duty of the Board after November 3, 2005, was to duly meet and propose an amendment, for shareholder approval, to the Articles of Incorporation and to reduce the class of issued common stock from 800,000,000 to 400,000,000 shares. In 2006, the Company reported 239,020,817 issued shares.  The Board should have proposed reducing the number of authorized stock accordingly, and submit the amendment to the shareholders within thirty days.  If the Board had acted responsibly and according to its fiduciary duty, 400,000,000 shares of authorized stock would have been eliminated and preserved the stockholder equity in the Company and allowed the stockholders the right to vote should there be a future event that required an increase of shares.

118.   For the year ending in 2006, the Company and Board failed to have a stockholder meeting in order to vote for the decrease in the number of shares.

PLAINTIFF'S COMPLAINT FOR DAMAGES

119.   On August 8, 2006, MegaPath, Inc. and its wholly owned subsidiary, MDS Acquisitions, Inc., reported on SEC Form 3 that it converted and took possession and held derivatively 298,987,342 shares of common stock.  At this time, MegaPath, Inc. and its wholly owned subsidiary, MDS Acquisitions, Inc., also disclosed that it was the holder of 2,605,554,164 derivative shares of common stock that was convertible only after a shareholder vote to approve the increase of shares. All of this was illegally done before regulatory approval.  Also, it was all done without a shareholder vote.  Finally, the Company only reported 239,020,817 of shares had been issued, when Plaintiff is informed and believes that least 538,008,159 shares that were likely issued.  Plaintiff alleges that this was done to avoid Delaware Franchise Tax.

120.   The Company reported only one Board of Director, David Struwas. The officers reported at the close of 2006 were David Struwas and Walter Keisch and Marc Esterman.

**Background to the MegaPath Acquisition**

121.   As of January 1, 2006, DSL.net had recently eliminated the senior debt of VantagePoint and Deteusche Bank.  By doing so, the Company eliminated the need and purpose for which it had increased the number of authorized shares from 400,000,000 in 2003 to 800,000,000.  As of January 1, 2006, the number of issued shares were only 233,620,817 (according to year-end 2005 tax filings) and the Company and Board, under Delaware law, had a fiduciary obligation to decrease the

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

number of shares since the event for increasing the number of shares had been eliminated.  The failure to do so was not only a breach of fiduciary duty, but caused the Company to be ripe for a take over.  As will be shown below, the failure to reduce the number of shares also made it such that the shareholders were effectively eliminated from voting to approve any merger or event that would require a shareholder vote to increase the number of shares.

122.   As of August 21, 2006, DSL.net had a market capitalization of approximately $7.5 million. Also as of August 21, 2006, DSL.net was a party to two debt instruments – debt incurred to eliminate the interests of VantagePoint and Deteusche Bank.  The two debt instruments had an aggregate principal amount of $13 million, and were scheduled to mature on September 4, 2006. The two debt instruments were held by DunKnight and Knight Vision Foundation (collectively referred to as "Knight Companies"), which had two representatives on the DSL.net Board, including DSL.net's President and CEO, Keir  Kleinknecht.   The Knight Companies had acquired the $13 million debt instruments less than a year earlier, in consideration of the payment to DSL.net of $10 million to eliminate VantagePoint and Deteusche Bank.  Specifically, the Knight Companies had paid DSL.net $6 million on November 3, 2005 and an additional $4 million on January 3, 2006 (the "DunKnight Transaction").

123.   In or about June of 2006, the Knight Companies, including Keir Kleinknecht and David Struwas, agreed to extend the maturity date of the debt from